## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| MONDIS TECHNOLOGY LTD., | § | |
|     Plaintiff, | § | |
| | § | |
| | § | CIVIL ACTION NO. 2:11-cv-378-TJW-CE |
| v. | § | |
| | § | |
| CHIMEI INNOLUX CORP., and INNOLUX | § | |
| CORPORATION, | § | |
|     Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

### I.   INTRODUCTION

Before the Court is Mondis Technology, Ltd.'s ("Mondis") motion for supplemental damages for 2011 sales and for an ongoing royalty rate.   (Dkt. No. 1.) [1]   The Court GRANTS-in-part and DENIES-in-part Mondis's motion.   The Court awards Mondis $1,971,810 in damages for its 2011 supplemental sales that were not considered by the jury.   The Court sets the ongoing royalty rate for monitors at 1.50% and the ongoing rate for televisions at 0.75%.   The following pages outline the Court's reasoning.

### II.   BACKGROUND

On June 13, 2011, the parties picked a jury in this patent infringement case.   Mondis asserted the following claims against Chimei-InnoLux Corp.'s and InnoLux Corp.'s (collectively "InnoLux" or "Defendant") accused products: claims 3, 15, and 20 of U.S. Patent No. 6,247,090 (the '090 Patent), claims 9 and 25 of U.S. Patent No. 6,513,088 (the '088 Patent), claim 18 of U.S.

---

[1]  When the Court is referring to the docket numbers in the 2:11-CV-378 case, it will merely list the docket number.   When referring to the docket numbers in the original case, the Court will include Case 2:07-cv-565 in its citation.

Patent No. 6,549,970 (the '970 Patent), claim 15 of U.S. Patent No. 7,089,342 (the '342 Patent), claims 14 and 23 of U.S. Patent No. 7,475,180 (the '180 Patent), claims 1 and 11 of U.S. Patent No. 6,057,812 (the '812 Patent), and claim 1 of U.S. Patent No. 6,639,588 (the '588 Patent).

On June 27, 2011, the jury returned a verdict.  (*See* Jury Verdict, Case 2:07-cv-565, Dkt. No. 586.)  The jury found the following claims valid and infringed: claim 15 of the '090 Patent, claim 15 of the '342 Patent, claims 14 and 23 of the '180 Patent, claims 1 and 11 of the '812 Patent, and claim 1 of the '588 Patent.  The jury found the following claims invalid and also not infringed: claims 3 and 20 of the '090 Patent, claims 9 and 25 of the '088 Patent, and claim 18 of the '970 Patent.  The jury found that InnoLux's accused products that it sold to the Hewlett-Packard Company ("HP") were covered under a license between HP and Hitachi (who was Mondis's predecessor-in-interest to the patents-in-suit).  The jury also found that InnoLux's infringement of the '090 Patent, '342 Patent, and the '180 Patent was willful.  The jury found the amount of damages to be $15,000,000.00.  In the Court's Memorandum Opinion and Order regarding the parties' motions for JMOL, the Court granted JMOL that all asserted claims are infringed by InnoLux's accused products, the Court granted JMOL of no willful infringement of any of the asserted claims, and the Court otherwise upheld the jury's verdict.  (Case 2:07-cv-565, Dkt. No. 662.)  The Court then entered final judgment in Case Number 2:07-cv-565 in accordance with the jury's verdict and the Court's rulings on the parties' motions for JMOL.  (Case 2:07-cv-565, Dkt. No. 666.)

In the final judgment, however, the Court *sua sponte* severed Mondis's motion for ongoing royalties and supplemental damages for its 2011 infringing sales, and this new case number was created.  This issue was severed into this case because—in the event the undersigned could not

2

resolve Mondis's motion before the undersigned retires at the end of September—the parties could

have an appealable final judgment in the original case.   This Memorandum Opinion and Order,

however, now resolves Mondis's motion.

## III.   DISCUSSION

### A.   Supplemental Damages for 2011 First and Second Quarter Sales

When the jury awarded damages in this case, it did not have before it the sales data for the

first and second quarter of 2011.   "A patentee is entitled to damages for the entire period of

infringement and should therefore be awarded supplemental damages for any periods of

infringement not covered by the jury verdict."   *Datatreasury Corp. v. Wells Fargo & Co.*, Case

No. 2:06-cv-72-DF-CE, Dkt. No. 2496, at 9 (E.D. Tex. Aug. 2, 2011).   The Court holds that

Mondis is entitled to supplemental damages for those two quarters of 2011, and the following

analysis discusses the amount of damages Mondis is entitled.

The Court holds that the proper rate for the supplemental damages is the same rates the jury

answered were applicable, which are 0.5% for monitors and 0.75% for televisions.   The only

issue remaining is to determine the amount of sales in the first and second quarter of 2011 to which

this royalty rate will be applicable.   As was the case at trial, InnoLux's sales are divided into a

"U.S." spreadsheet and a "non-U.S." spreadsheet.   The "non-U.S." spreadsheet refers to sales that

were directly made outside the United States.   However, many of those "non-U.S." sales result in

the product eventually ending up in the United States, which creates liability for InnoLux.   The

difficult issue, as was the case at trial, is determining how many of those "non-U.S." sales resulted

in the monitor ending up in the United States.   After Mondis originally proposed merely treating

all the "non-U.S." sales as creating liability, InnoLux stated in its response brief that "InnoLux can

3

agree for purposes of this motion that the portion of its 2011 non-U.S. sales that end up in the US can be extrapolated using Mondis's previous analysis" at trial.   (Case 2:07-cv-565, Dkt. No. 644, at 6.)   Mondis then accepted InnoLux's proposal.   (Dkt. No. 6, at 14.)   Then, days before the hearing on the issue, InnoLux attempted to retract its agreement, and provided an expert report and new analysis on the issue.   (Dkt. No. 9.)   At the hearing, Mondis argued InnoLux is judicially estopped.

The Court cannot hold that Mondis is judicially estopped because the Court never accepted InnoLux's position prior to it changing its position.   *See Source Search Techns., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1071 (Fed. Cir. 2009) (noting that the Federal Circuit applies the law of the regional circuit for judicial estoppel); *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 293-94 (5th Cir. 2004) (noting that the court must have accepted a party's prior position in order for judicial estoppel to apply in the Fifth Circuit).

The parties ignore, however, the doctrine of judicial admissions.   The Fifth Circuit[2] has explained judicial admissions as follows:

> A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them.   Although a judicial admission is not itself evidence, it has the effect of withdrawing a fact from contention.   A statement made by counsel during the course of trial may be considered a judicial admission if it was made intentionally as a waiver, releasing the opponent from proof of fact.   *McCullough v. Odeco., Inc*., No. CIV.A. 90-3868, 1991 WL 99413, at *2 (E.D.La. May 30, 1991).   By contrast, an ordinary evidentiary admission is "merely a statement of assertion or concession made for some independent purpose," and it may be controverted or explained by the party who made it.   *McNamara v. Miller*, 269 F.2d 511, 515 (D.C.Cir. 1959).   "A

---

[2] The Federal Circuit has applied law from the regional circuit when evaluating a claim of a judicial admission.   *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1311-1312 (Fed. Cir. 2007).

> judicial admission is conclusive, unless the court allows it to be withdrawn; ordinary evidentiary admissions, in contrast, may be controverted or explained by the party." *Keller v. United States*, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995) (quoting John William Strong, McCormick on Evidence, § 254 at 142 (1992)).

*Martinez v. Balley's Louisiana, Inc.*, 244 F.3d 474, 476-77 (5th Cir. 2001).   The Fifth Circuit allows the treatment of statements in briefs as binding judicial admissions.   *City Nat'l Bank v. United States*, 907 F.2d 536, 544 (5th Cir. 1990).   This Court considers InnoLux's admission in its response brief as a binding judicial admission of fact that the dollar amount of "non-U.S." sales that end up in the United States are $49,136,594 for monitors and $64,062,231 for televisions. The Court also accept the parties' figure for "U.S." sales, which is still in complete agreement, to be $166,570,341 for monitors and $55,041,183 for televisions.   Applying the royalty rate discussed above with these sales figures results in damages in the total amount of $1,971,810. Therefore, the Court awards Mondis $1,971,810 in damages for the first and second quarter of 2011, which were not considered by the jury.

### B.   Ongoing Royalty Rate

The Court has carefully considered the parties positions and the applicable law with respect to the determination of an ongoing royalty rate.   For the following reasons, the Court sets the ongoing royalty rate for monitors in this case to be 1.50% and the ongoing royalty rate for televisions to be 0.75%.

#### 1.   *Legal Standard*

The legal standard governing the Court's award of an ongoing royalty rate is not yet settled in the Federal Circuit.   Prior to the Supreme Court deciding *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), it was more common for a victorious plaintiff in a patent infringement lawsuit to merely obtain an injunction to protect its intellectual property post-suit.   As Mondis

states in its brief, however, "*eBay* . . . stripped many patent holders of their right to injunctive relief, but not the right to enforce their patents."   (Dkt. No. 6, at 14.)   Presently, it appears that it is now more common for plaintiffs such as Mondis, who do not obtain an injunction in light of *eBay*, to move the Court to set an ongoing royalty rate for post-judgment infringement of the adjudicated patents-in-suit.

Since *eBay*, the Federal Circuit has on at least two occasions discussed the issue of the district court setting an ongoing royalty rate.   In *Paice LLC v. Toyota Motor Corp.*, the Federal Circuit was reviewing a decision from a district court in this District that had set an ongoing royalty rate.   504 F.3d 1293 (Fed. Cir. 2007).   In response to an argument that a district court did not have authority to set an ongoing royalty rate, the Federal Circuit observed that "[u]nder some circumstances, awarding an ongoing royalty for patent infringement in lieu of an injunction may be appropriate."   *Id.* at 1314.   Further, the Federal Circuit stated that after allowing the parties to attempt to negotiate an agreement for an ongoing royalty rate,[3] the "district court could step in to assess a reasonable royalty in light of the ongoing infringement."[4]   *Id.* at 1315.   Because in *Paice* the district court had *sua sponte* imposed an ongoing royalty rate after declining to issue an injunction, the Federal Circuit remanded the case for the district court to reevaluate its rate, take additional evidence, and give more reasoning for the rate the district court had chosen.   *Id.* Finally, the Federal Circuit in *Paice* concluded that "Paice's argument [fell] far short of demonstrating" that it was entitled to a jury trial to determine the amount of an ongoing royalty

---

[3]  The parties admitted to this Court at a hearing on this motion that the parties have been trying to negotiate but have not reached an agreement.   Furthermore, the parties indicated that they would be unlikely to reach an agreement even after further discussions.

[4]  *See also Telcordia Techns., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1379 (Fed. Cir. 2010) ("If the parties cannot reach an agreement, the district court should step in an assist or calculate on its own the appropriate rate.").

rate.  *Id.* at 1315-16.

In *Amado v. Microsoft Corp.*, the Federal Circuit briefly addressed its decision in *Paice* and the issue of ongoing royalties in the context of a district court's award of damages for infringing sales during the stay of a permanent injunction.  517 F.3d 1353 (Fed. Cir. 2008).  The Federal Circuit rejected Microsoft's argument that the reasonable royalty rate for post-verdict infringement should be limited to the reasonable royalty rate that the jury found for the pre-verdict infringement.  The court stated that "[t]here is a fundamental difference, however, between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement."  *Id.* at 1361.  The Federal Circuit then discussed the district court's determination of a royalty rate for the sales that took place after the grant of the injunction that was stayed.

These two Federal Circuit cases have certainly provided some guidelines for the district courts.  However, other than noting that the determination of an ongoing royalty rate is up to the district court's discretion,[5] the Federal Circuit has not announced a particular standard to be used in calculating an ongoing royalty rate.  In this District, there have been at least two recent cases that have performed a detailed analysis to determine an ongoing royalty rate.

In *Affinity Labs of Tex., LLC v. BMW North Am., LLC*, the court first performed a post-verdict *Georgia-Pacific*[6] analysis for the ongoing reasonable royalty rate.  --- F. Supp. 2d ----, 2011 WL 11933207, at *4-6 (E.D. Tex. Mar. 28, 2011).  The court in *Affinity Labs* used the jury's finding of the pre-judgment reasonable royalty rate as a "starting point" in its analysis under

---

[5] In *Paice*, the Federal Circuit noted that the district court's award of an ongoing royalty rate would be reviewed under an abuse of discretion standard.  *See Paice*, 504 F.3d at 1315 ("Thus, this court is unable to determine whether the district court abused its discretion in setting the ongoing royalty rate.").

[6] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

*Georgia-Pacific.   Id.* at *5.   After calculating how the post-trial reasonable royalty rate under *Georgia-Pacific* would be adjusted from the jury's pre-judgment royalty rate, the court then considered "whether, and by how much, this reasonable 'market' royalty should be increased to account for the fact that ongoing infringement will be willful."   *Id.* at *4.   The court then considered the factors from *Read Corp. v. Portec, Inc.*[7] to determine how much to enhance the royalty rate.   In *Datatreasury Corp. v. Wells Fargo & Co.*, the court also began the analysis of an ongoing royalty rate by conducting a post-verdict *Georgia-Pacific* analysis.   Case No. 2:06-cv-72-DF-CE, Dkt. No. 2496 (E.D. Tex. Aug. 2, 2011).   The court in *Datatreasury* used the "jury verdict as a valuable guide" and additionally increased the proper royalty rate based on the defendant's "status as an adjudicated infringer."   *Id.* at 32-33.   The court considered that the parties' changed post-judgment status was also due to the fact that the defendant was a willful infringer going forward.   *Id.* at 12-14.   Although the court considered this implicitly in *Georgia-Pacific* factor 15 instead of performing a *Read Corp. v. Portec, Inc.* analysis like *Affinity Labs*, the court noted that it would have reached the same result if it had performed a *Read Corp. v. Portec, Inc.* analysis.   *Id.* at 33 n.3.   Therefore, *Datatreasury*'s analysis of the ongoing royalty rate is effectively the same as *Affinity Labs*.

In light of this case law, the Court will proceed by first determining a post-judgment reasonable (ongoing) royalty rate under *Georgia-Pacific* and will use the jury's verdict in this case as a starting point and determine how the circumstances may have changed.   Then the Court will consider whether the ongoing infringement will be willful.   If so, the Court will consider how much to enhance the damages in light of this willful infringement.

---

[7] 970 F.2d 816 (Fed. Cir. 1992).

### 2.     Georgia-Pacific *Post-Trial Analysis*

The Court first performs this *Georgia-Pacific* analysis assuming that InnoLux's continued infringement is not willful and thus not considering the changed legal relationship between the parties as a result of InnoLux's status as an adjudicated infringer.   The Court will consider willfulness in the next section.   In light of this assumption of no willful infringement, under the facts of this case, the Court holds that the ongoing reasonable royalty rate will be 0.75% for monitors under solely *Georgia-Pacific* framework.

In determining a reasonable royalty rate, a consideration of the *Georgia-Pacific* factors is proper.   Those factors include:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia-Pacific*, 318 F. Supp. at 1120.

The parties make various arguments regarding the application of the *Georgia-Pacific* factors. Because the Court is using the jury's determination of a 0.5% royalty rate for monitors as a starting point,[8] the Court focuses on any new evidence that was not before the jury and additionally any changed circumstances (other than willfulness) between a hypothetical

---

[8] The Court understands Mondis's argument that the Court should actually consider a starting point jury rate of 0.75% in light of the jury's actual award for money damages. However, because the jury answered 0.5% for the specific question regarding the royalty rate, this Court holds that this rate is more appropriate to use as a starting point.

negotiation that occurred in 2005 (which the jury determined) and a hypothetical negotiation that would occur in 2011 after the judgment (which this Court is determining).   The parties have essentially presented to the Court no new evidence that was not already before the jury.   For example, there are no new licenses that the parties have presented consideration,[9] and to the extent the jury's verdict might be considered a "new license," it is already accounted for because the Court is using the jury's verdict as a starting point.   Rather, the parties mainly argue how the negotiation in 2011 changes the analysis because the jury's hypothetical negotiation occurred in 2005.

With respect to factor one, Mondis argues this factor weighs in favor of the rate being higher in 2011.   Mondis basically points to all the licenses it has entered into since 2005 and provides no argument that was not already heard by the jury.   InnoLux argues the evidence has not changed since the jury made its determination.   InnoLux misses the point, however, because although there is no new evidence, this does not change the fact that the evidence may be weighed differently for a 2005 negotiation than a 2011 negotiation.   The Court is not convinced, however, that this factor would be weighed any differently.   The licenses themselves are the same.   And although Mondis has been more successful in its licensing efforts since 2005, that is a more proper consideration for other factors such as 8-10.   Therefore, factor one remains unchanged from the jury verdict.

With respect to factor seven, the parties argue that since the patents have a shorter term from a 2011 negotiation, this affects the analysis.   Mondis argues it would increase the rate and InnoLux argues it would decrease the rate.   In this Court's view, it has not been provided

---

[9] Neither party has argues how the Hon Hai license might affect the analysis of factor one.   (*See* Dkt. Nos. 6 & 9.)

sufficient evidence to conclude that this fact changes the analysis either way.

One issue that InnoLux argues affects several factors, such as factor 3, 8, 9, and 10, is the fact that the jury's invalidity findings have reduced the scope of the required license.  That is, because the jury found nearly half the claims invalid, and because jury assumed infringement and validity for the purposes of the hypothetical negotiation, InnoLux argues this warrants a reduction in the reasonable royalty rate.  Specifically, InnoLux states that "[f]or the hypothetical negotiation, it was assumed that all asserted claims were valid.  But in view of the jury's verdict, this assumption has been proven wrong."  (Dkt. No. 9, at 9.)  The Court finds that InnoLux's argument is without merit.  The Court never instructed the jury how they should proceed in the event they find that some claims are valid and some are not.  The Court also never instructed the jury that they should consider *all* claims valid and infringed, regardless of their findings of infringement and validity, if they reach the question of damages and perform a hypothetical negotiation.  The Court did, however, instruct the parties that they should only reach the question of damages if the jury finds infringement and validity as to at least one claim.  Consequently, the jury clearly understood that Mondis is only entitled to damages if there is infringement and validity.  The most reasonable assumption, therefore, is that the jury assumed infringement and validity only with respect to those claims that the jury actually found infringed and valid.  This perhaps explains why the jury may have given a 0.5% royalty rate when even Defendant InnoLux was practically arguing for a rate of 1.0% at trial.

On the other hand, the Court primarily agrees with Mondis's argument that factors 8-10 weigh in favor of increasing the reasonable royalty rate determined by the jury.  With respect to these factors, Mondis points out that as opposed to 2005, the patented technology in 2011 has

12

proven to be more of a commercial success.   This is evidenced at least in part by Mondis having entered into over fifteen licenses in the industry.   In 2005, Mondis had not yet had near the success in licensing that it now has in 2011.   Therefore, this changed position in 2011 warrants an increase from the jury's determination, which was made for a 2005 hypothetical negotiation.

Finally, the Court considers factor 15, which addresses, among other things, the bargaining position of the parties.   Mondis argues that in light of the fact that InnoLux is now an adjudicated infringer, the parties bargaining positions have drastically changed since 2005.   Mondis states that the comparable licenses in this case "were all taken under uncertainty with respect to liability . . . [and] [i]t is absurd to posit that Mondis would license InnoLux for less than these other licensees who did the right thing and took an early license."   (Dkt. No. 6, at 8.)   The problem with Mondis's argument is that it made the same argument to the jury in this case, and the jury presumably considered that in its verdict.   Furthermore, when the jury determined damages based on a hypothetical negotiation in 2005, it also assumed that validity and infringement for those claims it found to be valid and infringed.   Therefore, InnoLux's status as an adjudicated infringer (aside from potentially willfulness) has not changed the parties' bargaining position with respect to the 2005 hypothetical negotiation as compared to the post-judgment negotiation.[10]   Accordingly, the Court holds that this factor has not changed since the jury verdict.

---

[10] The Court understands that the Federal Circuit in *Amado* stated that "[p]rior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty."   *Amado*, 517 F.3d at 1362.   This Court assumes that the Federal Circuit in that statement was merely speaking with respect to the reality of the circumstances prior to judgment, as opposed to the "hypothetical" determination made by the jury in this case.   The jury in this case, in accordance with long-standing Federal Circuit precedent, assumed validity and infringement for the hypothetical negotiation.   *See, e.g.*, *Lucent Techns., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed.").

Considering the factors as a whole, as compared to the jury's 2005 hypothetical negotiation that resulted in a royalty rate of 0.5% for monitors, the Court holds that, in a post-judgment negotiation, some factors weigh in favor of a higher royalty rate and no factors weigh in favor of decreasing the royalty rate. After conducting the post-judgment hypothetical negotiation, the Court concludes that the reasonable royalty rate should be 0.75% for monitors. The Court now determines if this rate should be enhanced for willful infringement.

3.     *Ongoing Infringement After Judgment Is Willful in This Case*

The Court holds that ongoing infringement by InnoLux is willful. Other courts in this District have come to similar conclusions for post-judgment infringement by a defendant. In *Affinity Labs*, the court stated that "[f]ollowing a jury verdict and entry of judgment of infringement and no invalidity, a defendant's continued infringement will be willful absent very unusual circumstances." *Affinity Labs*, 2011 WL 11933207, at *4. *See also Datatreasury*, at 12-14 (finding that ongoing infringement is willful). Even InnoLux does not dispute that ongoing infringement will eventually be considered willful; rather, InnoLux argues that the ongoing infringement should only be considered willful after InnoLux has exhausted its appellate rights. Essentially, InnoLux argues that it has not been proven that its appellate defenses are objectively reckless, and therefore, it should not be liable for willful infringement until if and when those defenses are rejected on appeal. For at least three reasons, the Court disagrees with InnoLux and holds that InnoLux's continued infringement is willful despite its potential appeal.

First, in this Court's view, this Court is not in a proper position to evaluate the merits of InnoLux's appeal, which would essentially be required if the Court accepts InnoLux's position. The court in *Datatreasury* recognized this point and stated that "[b]ecause the ongoing royalty rate

14

can be appealed together with the findings of infringement and no invalidity, the Court finds no reason to discount the royalty rate based on the possible outcome of an appeal." *Datatreasury*, at 14. Rather, the Federal Circuit is in a better position to evaluate the merits of the appeal—that is the Federal Circuit's role. This Court does not know exactly what issues InnoLux will appeal and does not have the advantage of hearing the arguments on appeal, unlike the Federal Circuit. Therefore, in this Court's view, the Federal Circuit can determine whether InnoLux should be considered a willful infringer in the period from the date of judgment to the date the appellate decision is rendered.[11] If the Federal Circuit disagrees with this Court's finding of ongoing willful infringement after hearing the appeal, then it can reverse on that issue.

Second, assuming *arguendo* that it is this Court's duty to evaluate the strength of InnoLux's appeal (before the appeal is filed), the Court holds that a potential appeal by InnoLux does not have sufficient merit to warrant finding that its continued infringement despite the judgment is not objectively reckless. As an initial matter, it is obviously this Court's opinion that InnoLux will not be successful on appeal, or the Court would have otherwise ruled in InnoLux's favor on various post-trial issues.[12] Although, as noted above, this Court is neither aware of what exactly InnoLux will be appealing nor its arguments on appeal, the Court can generally assume it

---

[11] The Federal Circuit could either make the determination itself or remand to this Court to make the determination—in light of the Federal Circuit's opinion on appeal. Indeed, the Federal Circuit in *Amado* instructed that when the district court in that case was considering how much to award for damages during the stay of an injunction pending appeal, the district court could consider "the infringer's likelihood of success on appeal." *Amado*, 517 F.3d at 1362. Therefore, at least in the context of that case, *after* the Federal Circuit considered the merits of the underlying appeal of the injunction, it was proper for the district court, *ex post*, to consider the merits of the defendant's appeal in determining the amount of damages.

[12] This is another reason why, in this Court's view, it is improper for this Court to evaluate the strength of the parties' appellate positions.

15

will likely be issues of claim construction, infringement, and/or validity.[13]

Speaking generally, claim construction issues are good candidates for appeal given the *de novo* standard of review.   The Court is not aware of any particularly close claim construction disputes that may have been dispositive, and the Court is not aware of what particular terms InnoLux might appeal.   InnoLux may view the Court's lack of a construction of "communication controller" (after InnoLux's agreement that the term needs no construction) to be an issue of claim construction (*see, e.g.*, Case 2:07-cv-565, Dkt. No. 568), but this Court disagrees.   The Court did not refuse to re-construe "communication controller" based on principles of claim construction; rather, the Court refused to re-construe "communication controller" based on the doctrine of judicial estoppel.[14]   The Federal Circuit applies the law of the regional circuit for issues of judicial estoppel, and the Fifth Circuit reviews a holding under the doctrine of judicial estoppel under an abuse of discretion standard, which is a high standard for InnoLux to overcome.   *See In re Texas Wyoming Drilling, Inc.*, 647 F.3d 547, 550 (5th Cir. 2011) ("[B]ecause judicial estoppel is an

---

[13] Neither party appears to contest the jury's damages determination, which would also generally be a likely candidate for appeal.

[14] Given the short time in which the Court needed to issue an Order, due to the trial, the Court has not yet had occasion to fully expound its legal basis for refusing to re-construe the term "communication controller."   (*See, e.g.*, Case No. 2:07-cv-565, Dkt. No. 568.)   The Court assumed the issue would be re-urged in a motion for new trial or JMOL in the original case (e.g., Case No. 2:07-cv-565) and the Court could more fully address the issue at that time, but InnoLux never re-argued its position in a post-trial motion and merely re-urged its objection to the jury charge.   The doctrine of judicial estoppel "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or earlier proceedings." *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 293-94 (5th Cir. 2004).   "Fifth Circuit courts have identified two limitations on judicial estoppel: (1) the position of the party to be stopped must be clearly inconsistent with its prior position; and (2) the court must have accepted that prior position." *Id.* at 294.   Based on the discussion in the Court's Order of June 17, 2011 (Case No. 2:07-cv-565, Dkt. No. 568), those requirements are clearly met and InnoLux is judicially estopped.   That is, InnoLux is judicially estopped from agreeing to a claim construction position, which this Court accepted in its claim construction order, and then urging a different position merely weeks before trial.

16

equitable doctrine, and the decision whether to invoke it [is] within the court's discretion, we review for abuse of discretion the lower court's decision to invoke it.") (interanal cites and quotes omitted); *Source Search Techns., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1071 (Fed. Cir. 2009) ("Whether judicial estoppel applies is a matter of regional circuit law.").

In addition, InnoLux's appellate positions for infringement and validity appear to potentially be even weaker. InnoLux has nearly conceded infringement, given the Court's unwillingness to re-contrue "communication controller," which, as discussed above, will be reviewed for abuse of discretion. Further, InnoLux has a high burden of proof by clear and convincing evidence for invalidity, and the Court's denial of InnoLux's JMOL of invalidity is reviewed under a standard that is not favorable to InnoLux.[15] Therefore, the Court concludes that a potential appeal by InnoLux lacks sufficient merit to find that its continued infringement, despite the judgment, is not objectively reckless.

Finally, the third reason the Court disagrees with InnoLux is because this Court agrees with the court in *Affinity Labs* that absent unusual circumstances, a defendant's continued infringement after it is an adjudicated infringer is willful—even before appeal. That is certainly true in this case. The jury found InnoLux liable for willful infringement on several claims. The Court only granted InnoLux's motion for JMOL of no willful infringement because there was no evidence of pre-suit notice for the claims the jury found were willfully infringed, and additionally, the Court found InnoLux was not objectively reckless. For InnoLux's ongoing infringement, notice is not

---

[15] The Federal Circuit reviews the district court's ruling on a JMOL under the standard of the pertinent regional circuit. *Siemens Medical Solutions USA, Inc. v. St.-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1277 (Fed. Cir. 2011). The Fifth Circuit reviews the district court's ruling on a JMOL *de novo*; however, that means the appellate court is applying the same deferential standard the district court applied, that is, the jury's verdict is reviewed for sufficiency of the evidence. *See Delan-Pyle v. Victoria Cty., Tex.*, 302 F.3d 567, 572 (5th Cir. 2002).

an issue.[16]   The only issue now is whether InnoLux's ongoing infringement, prior to the resolution of an appeal, is objectively reckless under *In re Seagate Tech, LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).   The Court holds that it is.   InnoLux would have the Court effectively adopt a standard that a party is not a willful infringer until after it has resolved all its rights on appeal and has lost.   Implicit in this argument is InnoLux's obvious lack of respect for the jury's verdict or this Court's judgment.[17]   Furthermore, InnoLux's position is contrary to the common law usage of willfulness, which was explicitly adopted by *In re Seagate*.   *Id.* at 1370-71.   As the Federal Circuit stated in *In re Seagate*, it adopted the Supreme Court's meaning of willfulness that comported "with the common law usage, which treated actions in 'reckless disregard' of the law as 'willful' violations."   *Id.* (internal cites and quotes omitted).   The term "reckless" does not represent the most stringent mental state in the law.   Mental states such as "knowingly" or "intentionally" are considered higher.   However, if after InnoLux exhausts its appellate rights it is still found to be an adjudicated infringer, by continuing to infringe, InnoLux would more accurately be considered to be acting "knowingly" or "intentionally" in disregard of the law (i.e., after appeals are exhausted, there is no uncertainty).   But if InnoLux's position was the law, it would not be considered in reckless disregard of the law until that same time, which would effectively be conflating the standard of reckless with knowingly or intentional.   In this Court's view, it would be more proper to consider it "reckless" to continue infringement after a jury verdict

---

[16] Additionally, neither parties disputes that InnoLux, by virtue of this case and the judgment, would necessarily meet the subjective prong of the willfulness test announced in *In re Seagate Tech, LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (noting the portion of the test that the patentee must also prove that the objectively-defined risk "was either known or so obvious that it should have been known to the accused infringer").

[17] As discussed *infra*, after the jury trial in this case, InnoLux's CEO told a Chinese newspaper that "The issue of patent infringement is being taken too seriously sometimes."

and judgment of infringement.   In other words, the Federal Circuit explicitly stated that a person

is reckless if it acts "in the face of an unjustified high risk of harm that is either known or so

obvious that it should be known."   *Id.* at 1371.   And this Court holds that absent unusual

circumstances that are not before this Court, a defendant is acting in the face of an unjustifiable

high risk of harm if it continues to infringe in light of a jury verdict and judgment of infringement.

Further, InnoLux does not cite any cases that state that in order for InnoLux's conduct to be willful

Mondis must show by clear and convincing evidence that InnoLux's defenses *on appeal* are

objectively baseless.[18]   As a result, the Court holds that InnoLux's ongoing infringement is willful

and enhancement is warranted.

### 4.   *Enhancement for Ongoing Willful Infringement*

As a result, the Court now determines how much to enhance based on willful

infringement.[19]   Ordinarily, a district court determines the amount to enhance damages for willful

---

[18]   InnoLux confuses cases that, on appeal, state that the defendant did not have an objectively
baseless position *at trial* or at the district court level, despite the jury disagreeing with the
defendant.   The determination of an ongoing royalty, however, is in a different procedural
posture.   The issue is not whether InnoLux had reasonable defenses at trial, which would be
relevant with respect to InnoLux's potential willful infringement for pre-judgment activity.
Instead, those defenses have already been evaluated by the jury and this Court, and those defenses
have been rejected for those claims for which this Court has entered a judgment of infringement.
So the issue for ongoing royalties is not merely whether those defenses were reasonable.   Rather,
the issue is whether, *in light of those defenses being rejected by a jury and district court*, those
defenses are still reasonable.

[19]   To be clear, it is this Court's view that the present facts are highly distinguishable from *Amado*,
which might be interpreted as counseling against a post-verdict royalty enhancement by
considering willfulness.   *Amado*, 517 F.3d at 1362.   *Amado* was not discussing a determination
of an ongoing royalty rate—like the present case.   Instead, *Amado* was reviewing a district court's
determination of damages for infringing sales during the stay of an injunction.   *Id.* at 1361-62.
Further, the Federal Circuit criticized the district court for considering willfulness during a
court-ordered stay of an injunction.   *Id.* at 1362.   But there has been no court-ordered stay of an
injunction in this case, so it is not improper to consider willfulness.   Finally, the Federal Circuit
criticized the district court for merely trebling the amount the jury found to be a reasonable royalty.

infringement by considering the factors from *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992). These factors include: (1) deliberate copying; (2) infringer's investigation and good-faith belief of invalidity or non-infringement; (3) litigation conduct; (4) infringer's size and financial condition; (5) closeness of the case; (6) duration of the misconduct; (7) remedial action by the infringer; (8) infringer's motivation for harm; and (9) concealment. *Id.* Both parties agree that these are the factors the Court should apply if it is determining the amount to enhance damages for willful infringement. Furthermore, the court in *Affinity Labs* applied these factors. *Affinity Labs*, 2011 WL 1193207, at *7-9. In this Court's view, many of these factors are not well-suited for analyzing future willful infringement, as the factors were designed to analyze a party's willful infringement in the past. For example, it is nearly impossible to determine the "duration of the misconduct," "litigation misconduct," or "remedial action" that will occur in the future. Therefore, the Court will consider those factors it finds applicable, and the Court will also consider, as *Read Corp.* noted, the principle these factors are designed to encompass. That is, "[t]he paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read Corp.*, 970 F.2d at 826.

In applying the factors, the Court holds that factors two and five weigh in favor of a strong enhancement, and all other factors are either not relevant or are not of significant weight considering the circumstances. As discussed at length above, given the judgment of infringement and validity, the Court holds that InnoLux does not have a good-faith belief of invalidity or

---

*Id.* In this case, however, the Court is not merely enhancing the jury amount. Instead, the Court is enhancing a post-judgment reasonable royalty determination based on the *Georgia-Pacific* factors, wherein the jury verdict was considered a starting point in the analysis.

noninfringement and that the case is not close.   In addition, because the paramount determination is the egregiousness of InnoLux's conduct, the Court considers InnoLux's corporate attitude, which is reflected by its CEO's statement to a Chinese newspaper after the verdict in this case, which reads in part: "The issue of patent infringement is being taken too seriously sometimes." (*See* "Chimei to Postpone Chinese Fab Investment," *The China Post*, June 29, 2011, at 5.)   The Court finds that this statement by InnoLux's CEO shows InnoLux's lack of respect for this Court and the jury's verdict.   It is also an affront to the United States patent system—a system of Constitutional origin.   The Court, therefore, finds that this also warrants a strong enhancement because it further reflects the egregiousness of InnoLux's conduct.   In accordance, the Court holds that the earlier calculated reasonable royalty rate of 0.75% should be doubled to account for enhancement due to willfulness.   This enhancement reflects the egregiousness of InnoLux's continued infringement while also considering that it could be worse, for example, if there was evidence that InnoLux had copied or if InnoLux was a competitor and was seeking to harm Mondis.   As a result, the ongoing royalty rate for monitors[20] is set at 1.50%.

## IV.   CONCLUSION

In conclusion, the Court GRANTS-in-part and DENIES-in-part Mondis's motion for supplemental damages for 2011 sales and for an ongoing royalty rate.   (Dkt. No. 1.)   The Court awards Mondis $1,971,810 in damages for its 2011 supplemental sales that were not considered by the jury.   The Court sets the ongoing royalty rate for monitors at 1.50% and the ongoing rate for televisions at 0.75%.   The Clerk of the Court is Ordered to CLOSE this case.

---

[20] The parties have not provided sufficient argument or evidence for the Court to calculate an ongoing royalty rate for the televisions.   Rather, it appears the parties are indifferent with respect to the televisions.   As a result, the Court concludes that for televisions the ongoing royalty rate will continue at 0.75%, which is the rate determined by the jury.

It is so ORDERED.

SIGNED this 30th day of September, 2011.

_T. John Ward_

T. JOHN WARD
UNITED STATES DISTRICT JUDGE